## Case No. 7,101.

### The ISABELLA.

[1 Paine, 1.] [1]

Circuit Court, S. D. New York. April Term, 1810.

[1] [Reported by Elijah Paine, Jr., Esq.]

N. Pendleton, for appellants.
N. Sanford, Dist. Atty., for respondents.

LIVINGSTON, Circuit Justice. The libels in this cause state—That the brig Isabella being a British vessel, and in the port of New-York on the 1st of May, 1808, and being bound to a foreign port, had then and there notice of the act laying an embargo, and on the 5th of the same month, at the city of New-York, took on board certain goods, wares, and merchandises, to wit: six cannon, two gun-carriages, ten planks, an arm chest filled with small arms, thirteen casks of powder, six barrels of flour, three hundred cannon balls, other than the provisions and sea stores necessary for the said voyage. That she afterwards proceeded with the said goods, &c. from New-York to the British province of New-Brunswick, and thence to St. Croix, in the West Indies. That the said goods, &c. were exported from the said city to the Atlantic Ocean.

Walter Burke in his claim states, that the said brig being in the city of New-York on the said 1st of May, and being notified of the said act, was bound to one or more ports in New-Brunswick, thence to one or more ports in the West Indies; and thence to a port in the United States. After a denial of the several allegations in the libels, the claim further states that the brig Isabella was a private armed brig, having on board when she arrived in New-York, six guns for her defence; and that she had on board when she sailed from the said city, on her said intended voyage, six guns and two gun-carriages for her protection against the enemies of Great Britain—that she also brought with her when she arrived, and had on board when she sailed, an arm chest filled with small arms, which her owner bought in New-York, and she took on board thirteen casks of powder for the same purpose, and also six barrels of flour for provisions for the crew; which articles were the armament, provisions, and sea stores of the said brig for her said voyage—that for the taking and carrying of said six cannon, their implements, and the other several articles, the claimant, who was master of the brig, obtained a regular permit from the collector. That after she had been examined by the officers of the customs, the collector knowing the said articles to be on board, besides all other provisions and stores, did grant him a regular clearance to proceed on the said voyage with the said cannon, provisions, and stores. That the brig on the 15th of May sailed on the said voyage and back to New-York, with the said stores and provisions on board, and which were not taken or intended as goods, wares, and merchandise, nor used as such, but were the armament of the said brig and her stores and provisions for the said voyage, and not otherwise. That she did not take any plank on board. That having a permit to take six cannon and their implements, she took on board in the open day-time sixty cannon ball for the same cannon, and as stores and implements for the same, a part of which were still on board.

On the filing of these libels and claims, several witnesses were examined; and after a hearing of the cause, the district court pronounced its sentence of condemnation, from which there is an appeal to this court.

The facts as well as the law have been much controverted in this cause, and the testimony and construction of the different acts of congress been commented on with great ability. Much was said in the course of the argument by the attorney for the defendant, to induce the court to believe that the sea stores properly so called, and enumerated in the two permits of the 26th April, and 12th May, 1808, were more than necessary for the voyage. This fact does not appear to be put in issue by the pleadings, and the court might therefore decline giving any opinion on it. If it were intended to rely on such excess, probably it ought to have been stated in the libel, and the particular excess been pointed out. This not being done, furnishes evidence that it was not the cause which led to the seizure of this property, and not appearing in the libel, the claimant cannot be supposed to come prepared to show that the sea stores were necessary. But the court having an opinion on the point, has no objection to express it. The first act laying an embargo permitted the departure of foreign vessels with their cargoes on board when notified of the act. Although nothing be said in this act of the provisions and sea stores which might be required for such vessel, it was fairly to be implied that every thing necessary to such departure was within the purview of the law; and we find that the collector of this port accordingly, probably under instructions from the treasury before the passage of the supplementary act, granted permits for what he deemed necessary provisions and sea stores, which were afterwards allowed to be taken by the act which passed on the 9th of January, 1808 [2 Stat. 453]. The discretion of judging not only what were provisions and sea stores, but what were necessary for the voyage, could be exercised by no one so well as by the collector of the customs. By him this discretion was assumed, and into the correctness of his decision, unless in the case of collusion between him and the merchant, this court would very reluctantly inquire. In this case then, so far as it regards the articles in these two permits, this discretion has been

exercised; and the only way in which it is attempted to deprive the claimant of the full benefit of it, is by an allegation that the second permit was obtained by fraud or imposition on the collector. The court does not think that this assertion is supported, or that the true destination of this vessel was concealed, and, therefore, it is under no necessity of deciding what would be the effect of such practices on the officers of the customs. The first permit, it is conceded, was regularly obtained from the deputy collector; but it is said that the collector would not have granted the one of the 7th of May, if he had known what his deputy had done. This may be so, and yet, non sequitur, that a fraud was practised. There is no proof that Mr. Gillespie, the owner's agent, knew of the first permit, or of the usage of the custom house for the deputy collector to grant permits, in the absence of his principal; but suppose both, he had a right to apply for a further supply of provisions and sea stores, even if he thought them extravagant, so long as the collector had an opportunity of determining on the propriety of his request. He could not imagine that the deputy collector would be absent from the custom house, nor does it appear that he was, nor that the other permit which had been executed so many days before, would not be returned, as appears was the practice, nor that the principal would not ask his deputy, whether any other permit had been granted. There was nothing improper therefore, in submitting the second application to the collector, and if he were remiss, which this court does not affirm, so long as neither Mr. Gillespie nor Mr. Burke made use of any misrepresentations to obtain a further supply, other than that of applying for it, the court is of opinion that the second permit was not fraudulently obtained, and that the claimant having acted under it, the vessel is not liable to forfeiture, although these supplies of provisions and sea stores may appear to have been somewhat extravagant.

The court will now proceed to inquire how far such forfeiture may have been incurred, by taking on board the cannon, gun-carriages, an arm chest, thirteen casks of powder, six barrels of flour, and the cannon ball; which are the allegations contained in the different libels, and on which only the parties are properly at issue. The taking on board of these articles with or without a permit, is urged as a ground of condemnation on the part of the United States, under the 5th section of the supplementary embargo law, which passed the 9th January, 1808, which subjects to forfeiture every vessel of this description, with her cargo, that shall take on board any specie, or goods, wares, or merchandise, other than the provisions and sea stores necessary for the voyage. Whether goods, wares, and merchandises, and cargo, as used in this section, be convertible terms, or whether sea stores, according to

the general and vulgar acceptation of these terms, do not include guns, ammunition, &c., do not appear questions on which the court is called upon to give an opinion. If the public officer to whom the execution and interpretation of these laws in this respect were necessarily confided, have been in the habit of considering articles when taken on board, either for the consumption of the crew, or for the armament, equipment, and defence of a vessel, as comprehended within this exception; and if the practice of merchants has conformed to this understanding, a court, in case of forfeiture particularly, will look very unwillingly elsewhere for a different meaning. The truth is, all the articles which the libel alleges the Isabella to have had on board, were goods, wares, or merchandise; but if they were taken on board under the inspection of the proper officer, and as sea stores, this court, where the transaction was fair on both sides, would hesitate very much before it pronounced that they were not provisions and sea stores necessary for the voyage.

It being admitted by the claim, that all the articles except the plank were on board, it becomes important, under the view which the court is disposed to take of this subject, to see in what manner they got there. That there was a permit for the six cannon and their implements, is a fact about which there is no dispute. Mr. Leaycraft, one of the inspectors and a witness for the United States, proves it. Taking his testimony in connexion with that of Messrs. Gillespie, Reins, Marselus, and Arthur, the court has no doubt that a permit was also granted for the six barrels of flour. Mr. Gillespie says expressly there were two permits in the hands of Mr. Leaycraft when the lighter was loading, one for the guns and their implements and the arm chest, and the other for the flour and some small stores. That all these articles were put into the lighter under the immediate eye and inspection of Mr. Leaycraft is abundantly proved, who must have been too vigilant an officer not to have seen what was going on, and too faithful, according to his own account, to have consented to it without the sanction of his superiors. Whether the guns were the same which came in the brig from the West Indies, or whether any came in her, has been much agitated. The evidence on this point is not satisfactory, but were it material, the court would require much stronger proof on the part of the United States than has been given, that she arrived without guns. The superficial inspection made by Norwood, proves only that they were not mounted. They may have been in the hold, and yet it might be very difficult for the master after the dispersion of his crew, to prove the fact. In this state of things the captain's claim, where there is no contradictory evidence whatever, deserves some attention. In a doubtful case it must ever be the disposi-

tion of a court, if a leaning in any case be justifiable, to lean against a forfeiture, and to decide questions of fact accordingly. Such then being the state of the testimony respecting this fact, the court thinks it a duty to believe that when the brig arrived she had on board six guns and an arm chest. Whether she took out the same or others of equal size, is not material. There is no evidence of any deception having been practised at the custom-house on this subject, either as to the number or size of the guns, other than what may be inferred from what is said to be contrary to its usage in such cases. Whatever this usage may have been, it is certain that it was not invariable, for in this very case there was a departure from it, according to the relation of one of the witnesses on the part of the United States. The collector should have required further proof at the time, if he thought it necessary, that this vessel was entitled to take out guns. Not having done so, the court will not easily lend its ear to suggestions of fraud and imposition, especially when so feebly supported as in this case, and where they are deduced rather from reference to a general usage of the custom-house than from any positive proof of undue practice or misrepresentation. It will have already been perceived that the court does not consider the taking of the guns, arm chest, or cannon ball on board under these circumstances, a cause of confiscation.

If Mr. Gillespie be credited, there is as little difficulty about the powder; and here the court must depart from all the rules by which testimony is to be weighed, before it can free itself from the influence which this testimony is entitled to. Without any interest in the event of this prosecution—placed in a situation which afforded him an opportunity of knowing every thing that was going on—under the obligations of an agent to act with more than ordinary circumspection—and without any attempt to impeach his character, how can the court refuse its assent to his relation, if not in conflict with that of other witnesses of equal credit. It must be confessed too, that his account of this whole transaction is such as it is natural to have supposed it to have been. Under this view of the testimony of the witness, the court feels itself bound to suppose that a regular permit was obtained for the gunpowder. It is hardly possible to believe that a man of ordinary prudence would have so publicly purchased and sent thirteen casks of powder on board of a vessel which had already incurred some suspicion, and which if discovered, would have inevitably occasioned her forfeiture. Independent then, of his positive asseveration on this subject, I should be disposed to think that a permit had been obtained. If one were had, and such is the belief of the court, the collector must have considered the powder as necessary sea stores for an armed vessel; and whether he judged right or wrong, there being no mala fides on either side, it is not the business of the court to condemn the property of an innocent man for the error of an officer in whom the government had vested a discretion.

Of the plank it cannot be expected that much will be said. It is not believed that great reliance is placed on this article's being on board. The probability is, for much credit is not due to the story of the Silvas, which in this respect is contradictory, that what plank might have been on board when the Isabella proceeded to sea, were the remains of some which had been sent thither by Brown the carpenter, for the purpose of repairs, and that the whole not being used, she carried a few feet in small pieces with her, to be used on her passage, it being usual, as Mr. Brown states, to have some pieces of spare plank on board of vessels in case of accident. This court cannot see in the letter or spirit of the embargo laws, any thing which calls for a condemnation of a vessel for taking away the remnant of a plank or two, which the master may have purchased and paid for to repair his vessel while in port, but all of which may not have been found to be absolutely necessary for that purpose.

Upon the whole, as every thing except the trifling article of one plank, or the part of a plank, was put on board under a license from the custom house, and under the inspection or with the knowledge of its officers, and a clearance granted with the opportunity of a full knowledge of every thing that had been put on board; and as the articles thus permitted to be taken, were, in the judgment of the collector, necessary provisions and sea stores, and were actually used as such; and as there is no evidence of fraud in the obtaining of the permits, or in any part of the transaction, this court thinks that no forfeiture was incurred, and therefore decrees that the judgment of the district court be reversed.